# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

FRANK JAMES, JR.,           )
                           )
            **Plaintiff,**      )
                           )     **Civil Action No. 3:10-00579**
     **v.**                        )     **Judge Nixon / Knowles**
                           )
**MICHAEL J. ASTRUE,**      )
**Commissioner of Social Security**   )
                           )
           **Defendant.**     )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 14. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 15. Plaintiff has filed a Reply. Docket No. 16.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

# I. INTRODUCTION

Plaintiff filed his application for DIB on December 1, 2004, and protectively filed his application for SSI on November 12, 2004[1], alleging that he had been disabled since January 3, 2002, due to bipolar disorder and heart and back problems.  Docket No. 12, Attachment ("TR"), TR 13, 44-46, 54.  Plaintiff's application for DIB was denied both initially (TR 31) and upon reconsideration (TR 33).  Plaintiff subsequently requested (TR 42) and received (TR 431-66) a hearing.  Plaintiff's hearing was conducted on November 29, 2007, by Administrative Law Judge ("ALJ") Linda G. Roberts.  TR 431.  Plaintiff, vocational expert ("VE"), Gary Sturgill, and witness, Toni Grenco, appeared and testified.  TR 431-32.

On January 23, 2008, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 13-23.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.
>
> 2.  The claimant has not engaged in substantial gainful activity since January 3, 2002, the alleged onset date of disability (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3.  The claimant has the following severe impairments: bipolar disorder and coronary artery disease (20 CFR 404.1520(c) and 416.920(c)).

---

[1]Both Plaintiff and Defendant, in their briefs, as well as the ALJ, in her decision, acknowledge that Plaintiff filed applications for both DIB and SSI.  Docket Nos. 14-1, 15, TR 13.  However, the undersigned was unable to find any paperwork within the record regarding Plaintiff's application for SSI, except for a Notice of Disapproved Claims dated May 18, 2005.  TR 35-38.  Because the existence of Plaintiff's claim for SSI has not been questioned and no issues pertaining to the application have been raised, the undersigned accepts the information provided by the ALJ regarding Plaintiff's application for SSI.  TR 13.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; sit for a total of about 6 hours in an 8 hour workday; unlimited ability to climb, balance, stoop, kneel, crouch, crawl, push, pull, reach.  The claimant is able to understand, remember, and carry out short, simple instructions as well as detailed instructions; has some but not substantial difficulty to maintain concentration, perform routine daily activities and complete a normal work week with acceptable performance/productivity; has some but not substantial difficulty to appropriately interact with the public, supervisors, and coworkers without significantly disruptive distractions or confrontations; is able to be aware of and appropriately respond to changes and hazards in the work place; has some but not substantial difficulty to set and pursue realistic work goals in the work setting.

6.      The claimant is capable of performing past relevant work as a stores laborer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from January 3, 2002, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

TR 15-23.

On March 13, 2008, Plaintiff timely filed a request for review of the hearing decision.

TR 7, 8.  On May 13, 2010, the Appeals Council issued a letter declining to review the case (TR

3-5), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This

civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.

---

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in: (1) her evaluation of Plaintiff's mental conditions; (2) her choice not to seek testimony from a medical expert; and (3) her reliance on the VE's allegedly faulty testimony. Docket No. 14-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1. Plaintiff's Mental Conditions

Plaintiff argues that the ALJ did not properly evaluate his mental conditions under 20 C.F.R. §§ 404.1520a and 416.920a because the ALJ did not consider: (1) the CRG assessments from the Mental Health Cooperative ("MHC"); (2) the conclusions of State agency psychologist Dr. Andrew Phay regarding Plaintiff's command hallucinations; or (3) the testimony of witness Toni Grenco. Docket No. 14-1. Plaintiff essentially argues that had those things been properly considered, the ALJ should have found that Plaintiff "has demonstrated significant limitations" so as to meet the criteria of Listing 12.04. *Id.*

Defendant responds that the ALJ properly evaluated Plaintiff's mental conditions and properly considered all available medical evidence. Docket No. 15.

The Regulations state that, "We will consider all evidence in your case record when we make a determination or decision whether you are disabled." 20 C.F.R. § 404.1520(a)(3). Regarding the "special technique" used for evaluating mental disorders, the Regulations, *i.e.*, 20 C.F.R. § 404.1520a provide:

> (b) *Use of the technique.* (1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . . If we determine that you have a

medically determinable impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

(2) We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. . . .

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. . . .

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degree of your limitation in the first three

functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

(2) If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. . . .

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.
. . . .

20 C.F.R. § 404.1520a.

Listing 12.04 contains an introductory paragraph with the diagnostic description for affective disorders, followed by three criteria, a combination of which must be satisfied with the criteria set forth in the introductory paragraph in order to meet or equal this Listing. *See* Listing 12.00A. Listing 12.04 states:

12.04 *Affective disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or

        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or

2.  Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractability; or
        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h. Hallucinations, delusions or paranoid thinking; or

3.  Bipolar syndrome with a history of episodic periods manifested by the full symptomatic pictures of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support,

and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.04.

Paragraph C of Section 12.00 for mental disorders explains:

> C. *Assessment of severity*. We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of marked decompensation. Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. See §§ 404.1520a and 416.920a.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.00C.

If Plaintiff's mental impairment satisfies the criteria of Listing 12.04, then "benefits are owing without further inquiry." 20 C.F.R. § 404.1520.

Using the "special technique" for evaluating mental disorders, the ALJ found the following regarding Plaintiff's functional limitations:

> In activities of daily living, the claimant has mild restriction. The claimant performed routine daily activities independently.

> In social functioning, the claimant has moderate difficulties.

> Although the claimant had some limitations in this area, there was no indication that he would act inappropriately toward coworkers or supervisors.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant demonstrated difficulty in maintaining concentration that could impair the ability to complete complex, detailed tasks efficiently, but he could still adequately perform simple and low leveled detailed tasks.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation.

TR 16.

The ALJ ultimately found that, although Plaintiff's bipolar disorder was a severe impairment, his "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04." *Id.* The ALJ explained:

> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The evidence does not document the severity of a depressive disorder and/or an anxiety disorder that has caused more than moderate limitations in functioning.

TR 16-17.

When evaluating Plaintiff's mental impairment, the ALJ discussed in detail Plaintiff's medical records from the MHC:

> Records from Mental Health Cooperative, dated August 19, 2003, to November 16, 2007, showed diagnoses of alcohol dependence in remission and bipolar disorder. . . . The initial Global Assessment of Functioning (GAF) score was 60. Thereafter, the GAF scores ranged from 45 to 55. There were regular visits for

medication management. Claimant reported that he remained sober and attended Alcoholics Anonymous meetings several times a week and was the chairperson for some meetings. It was reported in April 2004 that claimant was working daily at Opryland Convention Center but was not working as of November 2004. . . . Claimant lived in a trailer by his sister's house. His sister became ill and died in April 2005. Thereafter, claimant was helping care for her 12 year old daughter as well as babysitting occasionally for his girlfriend's child. His 36 year old nephew was also living with him. Claimant cared for 7 dogs. It was reported in August 2005 that claimant worked on cars. A functional assessment in February 2006 gave a Global Assessment of Functioning score of 55 stating that, <u>at worst</u>, claimant might be forgetful and would not keep up proper grooming; <u>at worst</u>, isolated self from others and experienced anxiety in social settings; <u>at worst</u>, might need assistance completing a task of staying focused on getting something done; and <u>at worst</u>, might need support and reassurance from others. . . . In July and September 2007, it was reported that claimant was working 2 jobs and had been robbed at work. Physically the claimant reported that he felt fine. In October 2007, claimant stated he had mild depression and anxiety with a lot of stress with relationships and financial problems but was able to cope. As of November 2007, claimant stated that he was doing okay with no medication side effects and did not need any assistance at this time. Depressive symptoms were responsive to medications but increased without medications. No side effects of medications were reported. Claimant primarily presented with depressive symptoms of decreased energy and concentration. Public interaction was moderately limited due to claimant's low mood and low interest. The claimant would not perform well in pressured situations. In a medical source statement dated November 21, 2007, Brandee Madden, an advanced practice nurse at the mental health center, gave slight (some mild limitations but individual can generally function well) limitations in understanding, remembering, and carrying out short, simple instructions and detailed instructions; making judgments on simple work-related decisions. There were moderate limitations (individual is still able to function satsifactorily) in interacting appropriately with the public, supervisor, and coworkers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting.

TR 19 (emphasis in original)(internal citations omitted).

As for the functional limitations provided in the CRG assessments, the ALJ specifically mentioned and quoted from the CRG completed in February 2006, demonstrating that these portions of the CRG assessments were also considered. TR 19.

Regarding the GAF scores within the CRG assessments from the MHC, the ALJ stated:

> Personnel at the mental health center gave Global Assessment of Functioning scores (DSM-IV manual) of 45 to 55. GAF scores of 50 and below indicate a serious impairment in social or occupational functioning. GAF scores of 51 to 55 indicate moderate symptoms or moderate difficulty in social or occupational functioning. While the GAF scores are an attempt to get a reading of the clinician's assessment of the patient's functioning and is useful in planning treatment, the numbers assigned are rather vague and do not readily correspond to how the Social Security Administration assesses disability based on the severity requirements. The ratings are not part of a standardized test and are of limited usefulness. It is just one piece of data and must be considered in the context of the record as a whole to obtain a longitudinal picture of the overall degree of functional limitation based on the extent to which the impairment interferes with the ability to function independently, appropriately, effectively, and on a sustained basis.

> In this case, the degree of limitation indicated by the low GAF scores is not supported in the body of the reports from the mental health facility or by the assessment by the nurse practitioner. The claimant maintains a busy lifestyle that includes attending Alcoholics Anonymous meetings, performing routine daily activities independently in addition to caring for his niece, girlfriend's child, and several pets. At one time, he was working 2 jobs. These examples are not consistent with the low GAF scores of 50. In addition, the narrative reports of contact demonstrate improvement in symptoms with medication management and therapeutic treatment. Therefore, based on the evidence of record as a whole, little weight is given to the GAF scores of 50 and below.

TR 21.

Although Plaintiff asserts that "[t]he ALJ failed to give any consideration to the assessment made by the treating professionals at Mental Health Cooperative as set out in the

15

CRG assessments . . .," the ALJ's decision clearly shows otherwise, as can be seen above.

Docket No. 14-1, TR 19, 21. While the decision does not mention the CRG assessments by name, the ALJ cites Exhibits 9F and 10F, which contain the CRG assessments, and also explicitly mentions the GAF scores contained within the CRG assessments. TR 19, 21, 271-79, 347-52.

With regard to the CRG assessments from MHC in which he was rated to be in the "Moderate" level in the categories of "Activities of Daily Living, " "Interpersonal Functioning," "Concentration, Task Performance, and Pace," and "Adaptation to Change," Plaintiff argues:

> Please note that no definition of "Marked" is found in the Social Security Administration's regulations. Generally speaking the forms provided to treating sources for completion by the Social Security Administration define "Marked" as a serious limitation in the named area but functioning is not precluded. The term "Moderate" used in the CRG assessments [] used by the Mental Health Cooperative . . . define "Moderate" limitation essentially the same as the Social Security Administration's definition of "Marked". The definition of "Marked" in the CRG assessment form is the same as the Social Security Administration's definition of "Extreme". The mere fact that terms used by the Social Security Administration is different than the terms and definitions used by the Mental Health Cooperative does not render the limitations documented by the Mental Health Cooperative to be of less value in assessing the claimant's limitations. The above cited limitations were assessed by the Mental Health Cooperative treating professionals and clearly fall within the intent of the regulations that the claimant have frequent, regular and serious limitations . . . .

Docket No. 14-1.

As mentioned above, under the Regulations, "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently,

appropriately, effectively, and on a sustained basis." 20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.00C. Through the "special technique" for evaluating mental disorders discussed above, the Regulations unequivocally delegate the task of "rating the degree of functional limitation" to the ALJ. *See* 20 C.F.R. § 404.1520a(c). As such, the ALJ is not bound by the ratings of Plaintiff's functional limitations provided by other sources. While the MHC may use a different meaning for each of its ratings than the meanings used by the SSA, the ratings themselves are not determinative. The ratings in the CRG assessments are recommendations to be considered by the ALJ along with the explanations provided to support those ratings, and the other evidence of record. Here, the ALJ considered the CRG assessments from the MHC along with the other evidence of record in determining the degree to which Plaintiff's mental impairment affects his functional abilities. TR 16-22. The ALJ, therefore, properly considered the CRG assessments from the MHC.

With regard to Plaintiff's argument that the ALJ did not consider the conclusions of State agency psychologist Dr. Andrew Phay relating to Plaintiff's command hallucinations, the ALJ discussed the opinion evidence of record:

> Brandee Madden, an advanced practice nurse at the mental health center, gave an assessment for "slight" to "moderate" limitations in functioning which the vocational expert testified are consistent with the ability to perform unskilled work. The opinion of the treating source is given controlling weight in that it is well supported by the evidence as a whole and consistent with the other substantial evidence in the record.

> Consideration has been given [to] the opinions of the state agency consultants in accordance with Social Security Ruling 96-6p. These assessments are accepted as valid in that they are consistent with and supported by the evidence as a whole.

TR 21 (internal citations omitted).

17

Dr. Andrew Phay is a state agency consultant who provided a psychiatric review of Plaintiff which is labeled as Exhibit 5F in the record. TR 195-207. As can be seen above, the ALJ's decision cites Dr. Phay's assessment and indicates that it is accepted as "valid" and "supported by the evidence as a whole." TR 21. Plaintiff specifically argues that "the ALJ never even mentions the conclusions reached by Dr. Andrew Phay regarding the lack of capabilities due to the command hallucinations experienced by the Plaintiff or that Dr. Phay (a state agency reviewing psychologist) concluded that the Plaintiff's mental health allegations were credible. ..." Docket No. 14-1, *referencing* TR 207. Plaintiff is correct that Dr. Phay, on his psychiatric review technique form, discusses Plaintiff's credibility and periodic command hallucinations. But it was unnecessary for the ALJ to explicitly discuss either of these facts because Dr. Phay ultimately concluded that Plaintiff had only "moderate functional impairments" and did not meet the "paragraph C" criteria of the Listing 12.04. This conclusion is consistent with the ALJ's evaluation of Plaintiff's functional limitations, as discussed above. TR 205, 206, 207. Plaintiff does not cite any authority for the proposition that the ALJ should have given more weight to Plaintiff's credibility or periodic command hallucinations than did Dr. Phay. The ALJ properly considered Dr. Phay's opinion.

Plaintiff also argues that the ALJ erroneously failed to consider the testimony of witness Toni Grenco. Docket No. 14-1. Specifically, Plaintiff contends:

> In her analysis of the case the ALJ recites some of the testimony of the Plaintiff but she failed to acknowledge or consider the testimony of Toni Grenco. The ALJ did however carefully pick statements made by Ms. Grenco in the third party adult report, such as he helps his sister and he feeds the dogs . . . . What is missing from the analysis is the overall picture painted by Ms. Grenco, and not merely the snap shot version recited by the ALJ.

*Id.*

With regard to Ms. Grenco, the ALJ explicitly stated as follows:

> The witness, Toni Grenco, corroborated claimant's testimony that medications caused sleepiness and that when on medications claimant looked like a zombie with his eyes glazed over and drooling. Claimant could not complete tasks, his mind jumped from one thing to another, and he could not take care of himself. Without medications, claimant would get anxious and then went out of control becoming violent through withdrawal.

TR 20.

While the ALJ notes that Plaintiff "helped care for his ill sister" and took care of his seven dogs, the ALJ also mentions portions of Ms. Grenco's testimony, as quoted above, which support Plaintiff's allegations of disability. TR 20, 90, 91, 93. Although the ALJ does not discuss every detail of Ms. Grenco's testimony, the ALJ's decision demonstrates that Ms. Grenco's testimony was considered, and reflects that her testimony largely "corroborated" Plaintiff's own testimony. TR 20. As such, the ALJ's decision demonstrates that she considered the aspects of Ms. Grenco's testimony and third party function report that both supported and undermined Plaintiff's allegations. TR 20, 90-98.

As the ALJ stated in her decision, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." TR 17; *see* 20 C.F.R. § 404.1529. Ultimately, the ALJ concluded that, "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements, *as well as the statements of the witness,* concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible as documented by records from treating sources and examining sources as discussed in

the preceding paragraphs, and as evidenced by the claimant's presentation and level of independent functioning." TR 22 (emphasis added). The ALJ properly considered the testimony of Ms. Grenco.

As can be seen, the record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ in evaluating the severity and effects of Plaintiff's mental impairment, and all of which constitute substantial evidence. Additionally, the ALJ's decision demonstrates that he carefully considered the CRG assessments from the MHC, the psychiatric review of Dr. Phay, and the testimony of the witness, Ms. Grenco. As has been shown, the ALJ followed the "special technique" for evaluating mental disorders; the ALJ properly considered all of the evidence in evaluating Plaintiff's mental impairment; and the ALJ's determination that Plaintiff did not meet Listing 12.04 is supported by substantial evidence. Accordingly, Plaintiff's argument fails.

**2. Medical Expert**

Plaintiff argues that "the ALJ abused her discretion by not having [a medical expert] testify" because "[a]t the hearing the [medical expert] would have provided clear information needed to properly assess the claimant's mental limitations and provide a proper assessment of the limitations based upon the global situation and the [medical expert] would have eliminated the confusion in regard to the definitions of the terms of limitations set out in the CRG assessments." Docket No. 14-1. Specifically, Plaintiff contends that medical expert opinion testimony was necessary to explain the fact that the term "Moderate" in the CRG assessments is "equal to the generally recognized definition of 'Marked' as that term is used by the Social Security Administration." *Id.* Plaintiff argues that the medical expert opinion would have

clarified and explained the mental treatment evidence and how it related to Plaintiff's "ability to work or the lack of an ability to work at the SGA level of employment." *Id.*

As Plaintiff concedes in his brief, an ALJ's use of medical expert opinions is discretionary, and an ALJ *may* use medical expert opinions to clarify and explain conflicting or confusing evidence. *Id.* The Regulations provide that, "Administrative law judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404.1527(f)(2)(iii) (emphasis added).

Plaintiff apparently argues that because he had been assessed with "Moderate" limitations in the CRG assessments, and because the term "Moderate" in a CRG assessment is "equal to the generally recognized definition of 'Marked' as" used by the SSA, Plaintiff actually met the "Marked" impairments requirements of Listing 12.04. As discussed above, however, the ALJ is not bound by the ratings of Plaintiff's functional limitations provided by other sources. Simply put, the ALJ did not need a medical expert opinion to clarify the differences in terminology because the ratings themselves are not determinative. The ratings in the CRG assessments are recommendations to be considered by the ALJ along with the explanations provided to support those ratings, and the other evidence of record. There is nothing in the record to indicate that the ALJ in the case at bar failed consider the record as a whole. In fact, the ALJ properly evaluated the entirety of the evidence of record. It is also noteworthy that, despite this argument, Plaintiff's counsel did not request that the ALJ obtain medical expert opinion testimony to explain any alleged functional equivalence.

As discussed above, the ALJ's determination that Plaintiff's mental impairment did not

meet Listing 12.04 is supported by substantial evidence; she had sufficient evidence regarding the nature and severity of Plaintiff's mental impairment; and she did not need testimony from a medical expert in order to properly evaluate Plaintiff's mental impairment. Plaintiff's argument fails.

### 3. VE's Testimony

Plaintiff argues that the ALJ erred in relying on the testimony of the VE because the VE erroneously evaluated Plaintiff's past relevant work. Docket No. 14-1. Specifically, Plaintiff contends that, "There is no evidence in the record that indicates that the Plaintiff ever performed work as a retail store clerk or laborer, stores." *Id.* Plaintiff contends that the job classified by the VE as that of "laborer, stores" "falls far short of meeting the regulatory requirement of past relevant work" because Plaintiff "did not perform the job at the substantial gainful activity level, and there is no proof in the record that he did the job long enough to 'learn to do it.'" *Id.*

Defendant essentially responds that Plaintiff is not disabled and that the ALJ properly relied upon the testimony of the VE. Docket No. 15. Specifically, Defendant states that: (1) Plaintiff confirmed in his testimony that he had worked in a grocery store, and had "pulled" boxes in a warehouse; (2) the VE testified that Plaintiff could do his past work as a stores laborer; and (3) the VE testified that there were other jobs in the economy that Plaintiff could perform, such as counter clerk, cashier, and security guard. *Id.*

During the hearing, the ALJ questioned Plaintiff about his work history. TR 435. The VE also questioned Plaintiff and asked about the nature of his work at Cumberland Electric. TR 436. Plaintiff stated that Cumberland Electric was a temporary employment agency that placed workers with different companies, and, through that agency, Plaintiff had been placed with a

manufacturer for Kroger, a supermarket chain. *Id.* Plaintiff described the nature of his work for

the manufacturer as "pulling boxes" in a warehouse. *Id.*

Later in the hearing, the ALJ asked the VE to "please comment on the significance of this

gentleman's education, age, work history, and enumerate any skills his past relevant work may

have provided him." TR 450. The VE responded:

> ... [Plaintiff] is classified by the Social Security Administration as
> a younger individual. He has limited education. His past relevant
> work includes that of a retail stock clerk, which the DOT
> classifies as heavy and semi-skilled work. As a landscape laborer,
> which is classified as heavy unskilled work and then lastly as a
> laborer, stores, . . . and that work is classified as medium and
> unskilled and in the case of the stock clerk I find no transferability
> of skills ...

*Id.*

The ALJ also proffered a series of hypothetical questions to the VE. TR 450-53. In

response to the ALJ's first proffered hypothetical question (based upon Exhibit 6F), the VE

testified that the hypothetical claimant would be able to return to Plaintiff's past relevant work as

a stores laborer, given the residual functional capacity determined by the ALJ. TR 451. In

response to the ALJ's second hypothetical (based upon Exhibit 11F) and third hypothetical

(based upon a combination of Exhibits 6F and 11F), the VE testified that, under both those

scenarios, the hypothetical claimant would be able to return to Plaintiff's past work. *Id.* In

response to the ALJ's fourth hypothetical (based in part on Plaintiff's testimony and subjective

complaints), the VE testified that the hypothetical claimant would not be able to return to

Plaintiff's past work, but that other jobs would exist at a reduced range of light work that the

hypothetical claimant could perform. TR 452.

The ALJ proffered a fifth hypothetical question to the VE that combined hypothetical

question 4 with the mental component of Exhibit 11F, and asked the VE whether there would be jobs in the US and Tennessee economies that would be available for the hypothetical claimant to perform. TR 453. The VE responded that jobs would be available, and provided the examples of counter clerk (approximately 1,000 in the state, and 58,000 nationally), cashier (approximately 20,000 in the state, and 1,000,000 nationally), and unarmed security guard (approximately 1,400 in the state, and 82,000 nationally). *Id.* The VE also stated that, to his knowledge, the evidence that he provided did not conflict with the DOT. *Id.*

Plaintiff's counsel also questioned the VE and asked whether a person who became disoriented and could not concentrate after three or four hours would be able to work as a counter clerk, cashier, security guard, or maintain any gainful employment. TR 454-55. The VE answered, "No." *Id.*

Ultimately, the ALJ concluded that Plaintiff could return to his past relevant work as a "stores laborer." TR 22. The ALJ also provided the following rationale:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform the job as a stores laborer as actually and generally performed.
>
> Alternatively, considering the claimant's age as a younger individual, limited tenth grade education, and work experience, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" would therefore be appropriate under the framework of Medical-Vocational Rule 203.26.

*Id.*

Although Plaintiff asserts that there is no evidence that he ever worked as a stores laborer, the record indicates otherwise. On his "Work History Report," Plaintiff reported that he

had worked for Cumberland Electric,[3] a labor source, from 1997 to 2003. TR 82. As stated above, Plaintiff was questioned about the nature of his work for Cumberland Electric, and he testified that he worked "pulling boxes" in a warehouse for a manufacturer (TR 436), which the VE classified as "laborer, stores" (TR 450). Plaintiff's own work history report and testimony constitute evidence that he worked as a stores laborer.

Plaintiff further contends that there is "not sufficient proof to establish exactly what the job really was and how it would be classified in accordance with the Dictionary of Occupational Titles." Docket No. 14-1. Plaintiff's testimony regarding the nature of his work for the manufacturer was, however, enough for the VE to make a classification, and Plaintiff's description of this work matches the description of "laborer, stores" within the DOT. TR 436; *see* footnote three, *supra*. Under the Regulations, the ALJ may consider various sources of information regarding Plaintiff's past relevant work, including Plaintiff's own testimony. *See* 20 C.F.R. § 404.1560(b)(2).

Moreover, the Regulations define past relevant work as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). With regard to substantial gainful activity, the Regulations state as follows:

> Substantial gainful activity is work activity that is both substantial and gainful:

---

[3]Plaintiff, in his brief, notes that the Social Security earnings records show income for "Cumberland Labor LLC," not Cumberland Electric. Docket No. 14-1, TR 51-52. Cumberland Labor LLC is likely the actual name of the temporary employment agency for which Plaintiff worked. This discrepancy is, however, immaterial to the issue of Plaintiff's ability to perform his past relevant work. For purposes of consistency and clarity, the undersigned has referred herein to this employer as "Cumberland Electric."

(a) *Substantial work activity.* Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) *Gainful work activity.* Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572.

Although Plaintiff argues that his work for the manufacturer does not meet the definition of substantial gainful activity under the Regulations, this work was both substantial and gainful as defined by the Regulations. Because pulling boxes in a warehouse requires substantial physical activity and because Plaintiff was paid for it, this work meets the definition of substantial gainful activity. *See* 20 C.F.R. § 404.1572, *quoted* above. As the Regulations note, the fact that Plaintiff did this work on a part-time or temporary basis does not preclude it from being substantial, and the fact that Plaintiff may not have gotten paid much or made much profit from it does not preclude it from being gainful. *Id.* Plaintiff also argues that his work for the manufacturer did not last long enough for him to "learn to do it." Docket No. 14. Despite his argument, however, this work was unskilled in nature and thus does not require any significant period of time to learn. *See* 20 C.F.R. § 404.1568(a).

Finally, even if Plaintiff could not return to his past relevant work, he would still have been found "not disabled" because, as the VE testified and the ALJ recounted in her decision, there were other jobs that existed in significant numbers in the state and national economies that Plaintiff could perform.

Because the VE properly evaluated Plaintiff's past relevant work, the ALJ did not err in

relying on the VE's testimony. Additionally, as there is substantial evidence to support the ALJ's determination that Plaintiff is able to perform his past relevant work, including Plaintiff's testimony, the VE's testimony, and the DOT, the ALJ's determination stands. Accordingly, Plaintiff's argument fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge